Case No. 24-3646

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

RODNEY BURCH,

Plaintiff-Appellant,

v.

CITY OF CHUBBUCK, a political subdivision of the State of Idaho; and KEVIN
B. ENGLAND in his individual and official capacity,

Defendants-Appellees.
_____

On Appeal from the United States District Court for the District of Idaho
Honorable Amanda K. Brailsford presiding
Case No. 4:22-cv-00366-AKB
_____

**BRIEF OF APPELLEES**
_____

Blake G. Hall, ISB No. 2434
Sam L. Angell, ISB No. 7012
HALL ANGELL & ASSOCIATES, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Phone: (208) 522-3003
Facsimile: (208) 621-3008
*Attorneys for Appellees*

TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES ............................................................ iii

STATUTES AND REGULATIONS ........................................................................ iv

STATEMENT OF JURISDICTION ........................................................................ 1

RESTATEMENT OF ISSUES PRESENTED ........................................................ 1

STATEMENT OF THE CASE ................................................................................ 2

    A. Nature of the Case ........................................................................................ 2

    B. Statement of Facts ........................................................................................ 3

SUMMARY OF THE ARGUMENT ...................................................................... 6

ARGUMENT ........................................................................................................... 8

I.     THE DISTRICT COURT PROPERLY GRANTED SUMMARY
      JUDGMENT TO DEFENDANTS ON BURCH'S § 1983 CLAIM .............. 8

     a.   The District Court Applied the Correct Standard on Summary Judgment
        and Correctly Found that Burch's Speech was Made in his Official
        Capacity ...................................................................................................... 8

     b.   The District Court Correctly Determined that Burch was not
        Constructively Discharged .................................................................... 16

     c.   The District Court did not Err when it Correctly Determined that Burch
        Suffered no Other "Adverse Actions" as a Result of his Speech ......... 21

II.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY
      JUDGMENT TO DEFENDANTS ON BURCH'S IPPEA CLAIM ............. 28

     a.   The District Court did not Err When it Determined that Burch's IPPEA
        Claim was Untimely ................................................................................ 28

b.   The District Court did not Err When it Determined that Burch did not
Engage in Protected Activity under the IPPEA ......................................33

CONCLUSION ........................................................................................................41

CERTIFICATE OF COMPLIANCE .......................................................................42

STATEMENT OF RELATED CASES ....................................................................42

CERTIFICATE OF SERVICE .................................................................................43

# TABLE OF CASES AND AUTHORITIES

## Cases Cited

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ...................................................22

*Black v. Idaho State Police,* 155 Idaho 570 (2013) .................................................35

*Brooks v. City of San Mateo,* 229 F.3d 917 (9th Cir.2000) ....................................17

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir.2003)..........................................10

*Cryer v. Idaho Department of Labor*, 332 F.Supp.3d 1260 (D. Idaho 2018)...28, 33, 34

*Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013) ..........................9, 11, 13, 14, 16

*Dodge v. Evergreen School Dist. #114*, 56 F.4th 767 (9th Cir. 2022) ...............9, 10

*Eller v. Idaho State Police*, 165 Idaho 147 (2019) ....................................28, 32, 39

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................25, 26

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009)...................................8, 10, 16, 23, 25

*Fazio v. City and County of San Francisco,* 125 F.3d 1328 (9th Cir.1997)............26

*Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006) ........................................................16

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...................................................12, 13, 23

*Hunt v. County of Orange,* 672 F.3d 606 (9th Cir.2012)....................................25, 26

*Huskey v. City of San Jose*, 204 F.3d 893 (9th Cir. 2000)........................................17

*Lane v. Franks,* 573 U.S. 228 (2014).......................................................................10

*Nieves v. Bartlett*, 139 S.Ct. 1715 (2019) ...............................................................21

*Parrett v. City of Connersville*, *Indiana*, 737 F.2d 690 (7th Cir. 1984) .17, 18, 19, 21

*Patterson v. State Dept. of Health & Welfare,* 151 Idaho 310 (2011)....................33

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) .................................................17

*Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)...............................................8, 9, 23

*Poland v. Chertoff*, 494 F.3d 1174 (9th Cir. 2007)..................................................17

*Summers v. City of McCall*, 84 F.Supp.3d 1126 (D. Idaho 2015).........25, 26, 27, 34

*Thomas v. City of Beaverton,* 379 F.3d 802 (9th Cir.2004)....................................23

*Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968 (9th Cir. 2002) ................21

*Van v. Portneuf Med. Cntr.,* 156 Idaho 696 (2014) ("Van II") ...............................33

<u>Statutes, Rules, and Regulations</u>

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 1343(a)(3)–(4) ...........................................................1

28 U.S.C. § 1367 ............................................................................1

F.R.A.P. Rule 4(a) ..........................................................................1

F.R.A.P. Rule 4(a)(1)(A) ...............................................................1

F.R.A.P. Rule 26(a)(1)(B) ..............................................................1

F.R.A.P. Rule 39(a)(2) ...................................................................1

F.R.C.P. Rule 54(a) ........................................................................1

Circuit Rule 39.1(6) ......................................................................41

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the underlying federal case pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1343(a)(3)–(4), and 28 U.S.C. 1367 because Plaintiff/Appellant Rodney Burch ("Burch") brought a claim under Section 1983 and a related state law claim which the district court exercised supplemental jurisdiction over against Defendants/Appellees City of Chubbuck and Mayor Kevin B. England. ("Defendants"). 3-ER-447-448.

The district court's Judgment and associated Memorandum Decision and Order entered on May 10, 2024, was a final decision and appealable pursuant to Rule 54(a) of the Federal Rules of Civil Procedure and Rule 4(a) of the Federal Rules of Appellate Procedure. 1-ER-2; 1-ER-3-24. This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

Burch submitted his Notice of Appeal appealing the district court's Judgment and associated Memorandum Decision and Order on June 7, 2024, which was within the time for filing a notice of appeal pursuant to Rules 4(a)(1)(A) and 26(a)(1)(B) of the Federal Rules of Appellate Procedure. 3-ER-450.

## RESTATEMENT OF ISSUES PRESENTED

1. Whether the district court properly granted summary judgment to Defendants on Burch's § 1983 First Amendment claim.

2.      Whether the district court properly granted summary judgment to Defendants on Burch's state law Idaho Protection of Public Employees Act claim.

## STATEMENT OF THE CASE

**A.      <u>Nature of the Case.</u>**

Appellant Rodney Burch (hereinafter "Burch") filed the underlying federal case in the Federal District Court, District of Idaho alleging (1) a violation of § 1983 with regard to his First Amendment rights, and (2) a violation of the Idaho Protection of Public Employees Act ("IPPEA"). 3-ER-447-448.

Burch is a former employee of the City of Chubbuck (hereinafter "the City") and as the City's Public Works Director reported directly to Defendant Kevin B. England (hereinafter "England"), the Mayor of Chubbuck. 2-ER-236-7. Burch and England initially got along well, but as time went on Burch began to believe that he knew better than England how the City should be run and began advocating for a city administrator in "early 2021." 1-ER-4; 2-ER-237. Burch went so far as to send England a document titled "Options in Process" on June 1, 2021 which contained multiple criticisms of England and among other complaints accused England of being unable to "objectively address issues." 2-ER-51-55. England decided not to support the city administrator position, and as a result Burch supported England's opponent in the November 2021 election. 2-ER-40.

Following the election, in which England was reelected, Burch and England had a discussion in which Burch refused to resign, and England determined to ask the City Council to remove Burch. 1-ER-8. The City Council met in executive session and refused to remove Burch, directing Burch and England to find ways to work together. 1-ER-8; 2-ER-241. Burch continued as the Public Works Director and voluntarily resigned on March 3, 2022 through a letter to England, which took effect April 8, 2022. 2-ER-244.

Burch then filed suit on August 23, 2022, asserting the above-described claims. 3-ER-442-449. Defendants moved for summary judgment pursuant to Fed. R. Civ. Proc. 56 on December 15, 2023. 3-ER-410. Following briefing and oral argument, the district court granted summary judgment to Defendants on all of Burch's claims and dismissed the case in its Memorandum Decision and Order on May 10, 2024. 1-ER-3-24. This appeal followed, in which Burch seeks to have this Court overturn the district court's decision on Defendant's motion for summary judgment. The district court properly granted Defendants' motion, and this Court should therefore affirm the decision of the district court.

**B.** **Statement of Facts.**

1. Burch was formerly employed by the City as the Public Works Director beginning in July 2015. 3-ER-443.

2.      The Public Works Director was an "appointed" position, which meant that Burch could only be removed from his position by the City Council pursuant to Idaho state law and the City's Code. 1-ER-8.

3.      Burch's direct supervisor as the Public Works Director was England. 2-ER-237.

4.      Burch and England originally worked well together for the first six years or so of Burch's employment. 2-ER-147 (36:12-19).

5.      In 2021, Burch began to advocate that the City transition to a City Administrator form of government. 2-ER-37.

6.      Burch convinced several City employees and City councilors, including Councilmember Melanie Evans, to lend their support to his plan for a City Administrator. 2-ER-39-40.

7.      On June 1, 2021, Burch sent England a document entitled "Options in Process." 2-ER-51-55.

8.      This document contained several serious criticisms of England's performance as Mayor and as a supervisor, including accusations that England did not "understand what is really going on and appear to not have any interest," that England had no "clear / committed vision," and that England could not be trusted to "objectively address issues." 2-ER-52-54.

9.      The "options in process" document also indicated that Burch had been discussing his criticisms of England with other City employees. 2-ER-54; 1-ER-20.

10.     Sometime in June 2021, England informed Burch that England did not support the City administrator proposal. 2-ER-40.

11.     Because England did not support the City administrator proposal, Burch decided to support England's opponent, Dan Heiner, in the November 2021 election. 2-ER-40.

12.     Burch placed a sign for Heiner in his yard. 2-ER-40.

13.     Prior to the election, England did not discuss either Burch's support for Heiner or Burch's yard sign with Burch. 3-ER-328 (99:25-100:7); 3-ER-360 (24:22-25:7).

14.      England won the November 2021 election. 3-ER-404.

15.     On November 5, 2021, following the election, Burch and England had a meeting. The statements made at this meeting were disputed below, but according to Burch, England asked him to resign. 3-ER-404; 2-ER-239.

16.     Burch took the weekend to consider England's request and declined to resign on the following Monday. 2-ER-240; 3-ER-405.

17.     England called an executive session of the City Council to discuss removing Burch as the Public Works Director. 3-ER-405; 2-ER-240.

18.     The City Council declined to remove Burch from his position and directed Burch and England to continue working together. 3-ER-405; 2-ER-241.

19.     Burch and England had a brief discussion of their working relationship over email on November 15, 2021. Burch stated that he would "focus on his role as public works director, and that he would cease private conversations with members of the city council about the mayor's performance." 2-ER-242.

20.     Burch continued as the Public Works Director until he submitted a letter of resignation on March 3, 2022, effective April 8, 2022. 2-ER-244.

21.     Burch submitted a letter to Human Resources on April 7, 2022, the day before his resignation took effect, outlining his claimed grievances with the City and England. 2-ER-244; 3-ER- 407.

## SUMMARY OF THE ARGUMENT

Contrary to Burch's claims, the district court did in fact apply the correct standard in ruling on the Defendants' Motion for Summary Judgment. The district court consistently construed inferences in Burch's favor as the nonmoving party and relied primarily on Burch's own submitted documents and testimony in coming to its decision.

The district court correctly applied the relevant tests to Burch's claims that his First Amendment rights had been violated and that he had been constructively discharged. Burch failed to establish that he engaged in protected speech and failed

to establish any dispute of fact on the question of whether any speech he did engage in was a "substantial or motivating factor" in any alleged adverse action against him. Burch also failed to establish that he was constructively discharged. The district court was correct when it determined that Burch had failed to meet the high standard of constructive discharge. Additionally, Burch failed below to show that he was not subject to the policymaker exception. A review of the district court's decision demonstrates that the district court did consider all the facts and circumstances of the case in granting Defendants' motion and dismissing Burch's Complaint.

Finally, the district court correctly dismissed Burch's IPPEA claim on summary judgment and correctly found not only that Burch failed to file his IPPEA claim within the 180-day statute of limitations but also correctly found that Burch failed to show a genuine dispute of fact on whether he had engaged in any protected activity under the IPPEA. Although the district court did not reach this argument, Burch further failed to demonstrate that he did in fact suffer any adverse action and failed to demonstrate the existence of any causal connection between his claimed protected activity and any alleged adverse action, meaning that he could not have established his *prima facie* claim below.

Burch's disagreement with England was a disagreement over policy in which Burch offered serious criticisms of England and the way that he ran the City.

This dispute never implicated Burch's First Amendment rights and Burch was not a protected whistleblower under the IPPEA. Therefore, this Court should dismiss Burch's appeal and affirm the decision of the district court.

## ARGUMENT

I. **THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON BURCH'S § 1983 CLAIM.**

The district court correctly granted summary judgment to Defendants with respect to Burch's First Amendment claim. Burch was never subjected to any adverse actions as a result of any protected speech, was not constructively discharged, and did not suffer any adverse employment actions as a result of any speech that he did engage in. Therefore, the district court was correct in its decision and this Court should affirm the decision of the district court.

 **a. The district court applied the correct standard on summary judgment and correctly found that Burch's speech was made in his official capacity.**

As this Court has noted, "the state may not abuse its position as employer to stifle 'the First Amendment rights[its employees] would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir. 2009); *citing Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968). However, the state still has some interest in ensuring that its employees' exercise of their First Amendment rights does not impinge on the "efficiency of the public services it performs," as the Supreme Court acknowledged: "[t]he problem in any

case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Eng*, 552 F.3d at 1070; *citing Pickering,* 391 U.S. at 568.

In an attempt to achieve this balance, this Court has established a "five-step inquiry:"

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013); *citing Eng,* 552 F.3d at 1070. The first three factors are part of a plaintiff's *prima facie* case; if the plaintiff successfully meets the first three factors then the "the burdens of evidence and persuasion ... shift to the Defendants to show that the balance of interests justified their adverse employment decision." *Dodge v. Evergreen School Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022); *citing Eng,* 552 F.3d at 1074. Failure to meet any one of the five factors is fatal to a plaintiff's case. *Dahlia*, 735 F.3d at 1067, n. 4.

Whether speech is a matter of public concern is determined by whether "it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest.'"

*Dodge*, 56 F.4th at 777; *quoting Lane v. Franks,* 573 U.S. 228, 241 (2014).

However, speech that "deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Eng*, 552 F.3d at 1070; citing *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003).

The District Court correctly found that Burch's speech dealt entirely with "individual personnel disputes and grievances," as shown by Burch's November 15, 2021 email to England in which Burch "committed to you [England] that I would cease further private conversations with Council related to your performance" and would "focus on my role as Public Works Director thereby not overstepping my authority and willingly rely upon your management decisions to guide our organization." 2-ER-293. Burch's email clearly shows that his dispute with England was an individual personnel dispute related to his criticisms of England. Therefore, Burch's speech was not protected and Burch's First Amendment claim should be denied on appeal.

However, the Defendants acknowledge that the district court found that "Burch's communications regarding the city administrator position and his yard sign pertained to matters of public concern." 1-ER-12. The district court correctly found that even if Burch can meet the "public concern" factor, Burch's speech was not protected because Burch failed to meet the remaining *Eng* factors.

This Court in *Dahlia* identified three factors in determining whether a plaintiff is speaking as a "private citizen or public employee," first, "whether or not the employee confined his communications to his chain of command," second, "the subject matter of the communication," and third, whether a public employee is speaking "in direct contravention to his supervisor's orders." *Dahlia*, 735 F.3d at 1074-5. The district court found that while Burch's yard sign was speech that was "expressed in Burch's capacity as a private citizen," that Burch's communications about the city administrator position, both to England and to other City employees and Councilmembers, were "made in his capacity as a public employee under the *Dahlia* factors." 1-ER-14.

Burch alleges that the district court erred in determining that his speech was made in his capacity as a public employee, but Burch misconstrues both the district court's decision and the relevant case law in doing so. The district court's decision is full of citations to Burch's own deposition testimony, declarations, and other materials that Burch placed into the record to oppose Defendants' motion for summary judgment. Of particular note, the district court specifically acknowledged that it was viewing the facts in the light most favorable to Burch when it acknowledged that for the purposes of summary judgment, it was accepting Burch's claim that England asked Burch to resign during their meeting on November 5, 2021 following the election. 1-ER-7, n.3.

Burch's first claimed error similarly misconstrues the relevant case law. Although a "formal job description" "is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes," there is no case law stating that the job description cannot be considered, and in any case Burch's reliance on this point to attack the district court is unavailing because Burch undisputedly raised the city administrator issue with England, who was Burch's direct supervisor. *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006); 2-ER-237. Burch clearly raised the city administrator issue within his chain of command.

Notwithstanding Burch's claim before this Court that the City Council was outside his chain of command, Burch clearly showed that the City Council was in his chain of command when presented the strategic plan to the Council as part of his job duties, as he testified that he "presented it to the city council and the council adopted it." 2-ER-38; (Dkt. 9.1, p. 18). Further evidence that the City Council was part of Burch's chain of command is the fact that Burch could only be removed from his position by the City Council. 1-ER-8. Because the Council was part of Burch's chain of command, the evidence shows that Burch's communications were confined to his chain of command and therefore were not protected speech.

Furthermore, Burch does not point to any evidence in the record showing that the district court improperly drew any inferences in Defendants' favor when it

noted that Burch tried to develop a job description for the city administrator position in his official capacity. To the contrary, the district court relied on Burch's own declaration, in which Burch stated that "[a]s a resident of Chubbuck *and an employee*, I felt obligated to see that public funds were used in a strategic and efficient manner." 2-ER-37, emphasis added. The only evidence relied on by the district court was from Burch himself and clearly showed that Burch was engaging in speech and working with Mr. Gummersall in his capacity as *an employee* of the City of Chubbuck.

The second *Dahlia* factor, the subject matter of the communication, also shows that Burch's speech was made as a public employee and not as a citizen. Burch attempts to fault the district court for following *Garcetti* and not relying solely on his formal job description in determining that his job duties included strategic planning. (Dkt. 9.1, p. 19); 1-ER-15. However, the record shows that it is Burch who is picking and choosing which parts of the record he wishes to be deemed relevant, because as the district court correctly found, Burch testified that he presented the strategic plan to the City Council and the City Council adopted it. 2-ER-38. In *Dahlia*, this Court held that "[w]hen an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." *Dahlia*, 735 F.3d at 1075. The fact that Burch created a strategic plan and

presented it to the City Council for adoption indicates that such actions were routine for Burch and that the reporting of this plan was made within his official capacity as the Public Works Director. Burch's speech was therefore not protected under the First Amendment.

Finally, the district court did not err when it found that the third *Dahlia* factor, whether a public employee is speaking "in direct contravention to his supervisor's orders," weighed in favor of the fact that Burch's speech was made as an employee. In *Dahlia,* this Court found that "it is relevant to the resolution of Dahlia's case that Dahlia disclosed misconduct to LASD in contravention of the numerous threats and admonitions from his superiors not to reveal the misconduct to anyone. Even assuming *arguendo* that Dahlia might normally be required to disclose misconduct pursuant to his job duties, here he defied, rather than followed, his supervisors' orders." *Dahlia*, 735 F.3d at 1075. By contrast, Burch claimed that he listened to England's request to cease advocating for a city administrator. In his letter to Human Resources the day before his resignation took effect, Burch stated that "Mayor England changed his mind and indicated he did not support the idea and asked us to stop promoting it. At that time, I stopped advocating for the change and went back to business as normal." 2-ER-277.

Burch now claims that he continued to support the city administrator position, but he is mixing up his advocacy for the city administrator position to

England and the City Council with his support of England's opponent in the November 2021 election. Burch's letter clearly states that he made his support of Heiner "known to members of our community," not his continued advocacy for the city administrator position. 2-ER-277. England did not tell Burch to stop supporting Heiner, because England never discussed the election with Burch. 3-ER-328 (99:25-100:7); 3-ER-360 (24:22-25:7). Burch cites to an email that Councilmember Melanie Evans sent to England on June 9, 2021 in which she advocated for a city administrator and which Burch saw before Ms. Evans sent it. 2-ER-57-62. However, Burch testified that he was not attempting to change England's mind with this email:

> Q. I don't mean to be, again, too accusatory. But is this you working with a city council member to try to put some pressure on the mayor to do what you thought was best for the city?
>
> A. We were all involved with moving that forward *until the mayor changed his mind.* So this is a continuation of that process. Excuse me. "We all" meaning the mayor, myself, Scott, city council members.
>
> Q. It sounds like, as of the writing of this e-mail, though, the mayor had decided that he was no longer going to support that.
>
> A. Agreed.
>
> Q. It looks like you took at least some effort to try to change his mind.
>
> A. *I don't see that characterization.*

2-ER-156 (82:15-83:6), emphasis added. Burch conceded that he was not taking action "in contravention" of his supervisor England. Evidence that Ms. Evans

continued to speak in favor of the city administrator position is not evidence that Burch "defied, rather than followed" England's or any other supervisor's orders. The district court correctly found that this last *Dahlia* factor weighed in favor of a finding that Burch's speech was not protected, and the district court did not draw any inferences in favor of Defendants in coming to this conclusion. Since Burch failed to meet the second *Eng* requirement with regard to his communications to England and the City Council, Burch's appeal must be dismissed as to his claim that those communications were protected speech. The district court did not commit error and this Court should affirm the conclusions of the district court.

   **b.  The district court correctly determined that Burch was not constructively discharged.**

   After determining that only Burch's yard sign constituted protected speech, the district court correctly found that the yard sign was not a "substantial or motivating factor" in any alleged adverse action. 1-ER-16. The plaintiff bears the burden of showing that his speech "was a 'substantial or motivating' factor in the adverse action." *Eng*, 552 F.3d at 1071, *quoting Freitag v. Ayers,* 468 F.3d 528, 544 (9th Cir.2006). Although this is a question of fact, "[i]f the plaintiff does not sufficiently allege that the state retaliated for the employee's exercise of First Amendment rights, there can be no recovery..." *Id*.

   Burch failed to show that he had been constructively discharged below and has failed to do so again on appeal. As this Court has held, "[u]nder the

constructive discharge doctrine, an employee's reasonable decision to resign

because of unendurable working conditions is assimilated to a formal discharge for

remedial purposes. The inquiry is objective: Did working conditions become so

intolerable that a reasonable person in the employee's position would have felt

compelled to resign?" *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007);

citing *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). This Court in

*Poland* held that "evidence of transfer and demotion is insufficient, as a matter of

law, to establish a constructive discharge." *Poland*, 494 F.3d at 1184. Instead, this

Court stated that:

> constructive discharge occurs when the working conditions deteriorate, as a
> result of discrimination, to the point that they become sufficiently
> extraordinary and egregious to overcome the normal motivation of a
> competent, diligent, and reasonable employee to remain on the job to earn a
> livelihood and to serve his or her employer.

*Id.*, *citing Brooks v. City of San Mateo,* 229 F.3d 917, 930 (9th Cir.2000). This

Court has also held that a plaintiff has not suffered constructive discharge merely

because his or her "managerial responsibilities were reduced." *Huskey v. City of*

*San Jose*, 204 F.3d 893, 901 (9th Cir. 2000). Even drawing inferences in Burch's

favor and accepting Burch's version of the facts, it is clear that Burch was not

constructively discharged.

   Burch relied both below and on appeal on *Parrett v. City of Connersville*,

*Indiana*, 737 F.2d 690 (7th Cir. 1984), for his claim that he was constructively

discharged, but *Parrett* is easily distinguished from this case because Burch never suffered the sorts of adverse actions that the plaintiff suffered in *Parrett*. In that case, the plaintiff was a detective who investigated the daughter of a citizen who later became the city attorney. *Parrett*, 737 F.2d at 693. When the new city attorney took office, he demanded that the plaintiff resign. *Parrett*, 737 F.2d at 693. When the plaintiff refused, he was demoted and reassigned, as described by the Seventh Circuit:

> [T]he new police chief. . . acting on instructions from Cordes, told Parrett that he would not be assigned any police duties as "line captain." He was given a windowless room to sit in that formerly had been a storage closet. The room had a desk and chair but no other furniture. Parrett spent his shift sitting at the desk with nothing to do. The enforced idleness got on his nerves in a most serious way. He was hospitalized with symptoms of nervous collapse that included cardiac abnormalities.

*Id*. The plaintiff in *Parrett* was not terminated, but the Seventh Circuit noted that there was "no suggestion that cause existed to remove Parrett from the police force." *Id*. As the district court correctly found, Burch's case does not resemble the plaintiff's in *Parrett*.

Burch was not subjected to "enforced idleness," was not demoted, received no reduction in pay, and continued working as the Public Works Director until he voluntarily resigned. As an initial matter, Burch misconstrued Mr. Morrison's testimony about whether budgeting questions were being taken to him instead of to Burch. (Dkt. 9.1, p. 30). Mr. Morrison testified that discussions with the treasurer

regarding budgets was "a normal function of my job" and also testified, contrary to Burch's assertions, that although he once heard Mr. Morgan use the phrase "team Rodney," he did not recall the context of the phrase and did not know "if it was directed at me or if it was directed at someone else." 2-ER-188 (6:22-23; 8:12-14). This evidence therefore cannot support a claim of constructive discharge.

Furthermore, Burch's situation is not similar to that of the plaintiff's in *Parrett* because as the district court correctly found, Burch acknowledged that his duties were not reduced to nothing and that he was still working "near full time" even by his own estimation. 1-ER-18. Burch testified below that he had been working 2.8 "full-time equivalent" jobs, and that he asked England to "please help me manage some of these items." 3-ER-338 (139:9-10). Burch also testified that he was "exaggerating" in his April 7, 2022 letter and that ironically, if he had an employee who was fulfilling "no effective duty," he would have asked that employee to resign:

> Q. Towards the end, I want to ask you about a couple of comments that you made towards the end of that letter. You say, 'The net effect is I fulfill no effective duty on a daily basis, which is a blatant waste of our residents' dollars and reflects an organization that is more concerned with personal agenda than with what is best for our community.' I imagine you are probably exaggerating a little that you fulfill no effective duty.
>
> A. Uh-huh.
>
> Q. I mean, you told me that you were doing probably a .7 or .8.
>
> A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. In any event, what -- I guess, are you trying to say that by this letter you are reporting a waste of dollars in that there -- the city was paying you a full salary and you were only performing a .7 or .8 of your duty?

A. Correct.

Q. The solution to that -- would not the solution to that have been to remove your position, ask you to resign and remove that position?

A. I'm not sure of the question to me.

Q. Wouldn't you agree with me that the solution to that problem would be to ask you to resign and then not fill that position?

A. If I was the manager, I would have done that. Are you asking me –

Q. Okay.

A. -- if that's what the mayor believed was the right thing to do? I can't –

Q. No. I'm just asking you if –

A. I believe in effectively managing people and operations. So I would not have let someone sit in his office and do nothing. Sorry. There's a strong word. Do .7 FTE.

3-ER-347-348 (176:5-177:21). The district court correctly drew inferences in favor

of Burch when it determined that he had not suffered constructive discharge.

Burch's own testimony established that he was still working near full time, and

even if England did reassign Burch's duties as Burch claims, that a simple

reduction in "managerial duties" cannot support a claim of constructive discharge.

1-ER-18. *Parrett* is distinguishable because the plaintiff's duties in *Parrett* were reduced to nothing (not just "less than a third," as Burch claims) and he was told to sit in a closet, which did not occur in this case. (Dkt. 9.1, p. 35). Because Burch was not constructively discharged and cannot establish a dispute of fact on the question of whether he was constructively discharged, this Court should affirm the decision of the district court.

### c. The district court did not err when it correctly determined that Burch suffered no other "adverse actions" as a result of his speech.

The district court did not err when it held that Burch had not suffered any other "adverse actions" as a result of his yard sign, which was his only protected speech. Defendants disputed each of these below, but the district court, interpreting the facts in the light most favorable to Burch as the nonmoving party, assumed that each of the following constituted adverse action: "that Mayor England asked him to resign, requested City Council remove him as Public Works Director, and limited his workload." 1-ER-19.

As both Burch and the district court recognized, this Court has held that the adverse action must actually "cause the injury:"

> To establish a causal connection between the protected speech and adverse action, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must cause the injury." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (citation omitted). An employee may make this showing using either direct or circumstantial evidence. See *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). Examples of circumstantial evidence include: "[1] a

proximity in time between the protected speech and the adverse action, [2] the defendant's expression of opposition to the protected speech, and [3] evidence that the defendant proffered false or pretextual explanations for the adverse action." *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) (citation omitted).

(Dkt. 9.1, p. 38), 1-ER-19. Burch failed to show that there was any causal connection between his protected yard sign speech and any adverse action from Defendants. The district court found that there was a "proximity in time" between some of the alleged adverse actions and the November election (again, construing the facts in a light most favorable to Burch), and found that this weighed in Burch's favor. The district court also noted that Burch's own testimony established that the claimed limiting of Burch's workload did in fact start in June of 2021, after Burch criticized England's performance. 2-ER-40 ("In June or July 2021, Mayor England became very cool towards me. He started cutting me out of meetings and decisions, something that had never happened before. For example, decisions regarding how to use funds from the opioid settlement payments were made without me or Scott Gummersall.").

Burch's claimed evidence to the contrary is unavailing, and Burch continues to try and use other peoples' experiences, in particular Ms. Evans, to try and bolster his own testimony. (Dkt. 9.1, p. 40). What England may have said to Ms. Evans cannot establish whether Burch suffered any adverse actions and cannot establish whether those alleged actions were made because of Burch's speech.

Similarly, one offhand reference to Heiner as "[your] candidate" in the context of a discussion on a new building for city hall after the election is not sufficient to show that England asked Burch to resign or reduced Burch's workload due to Burch's support of England's opponent. 3-ER-330 (107:13).

Finally, the district court correctly determined that even if Burch was able to meet the first three elements of his *prima facie* case, the remaining two *Eng* factors weighed in favor of Defendants. If a plaintiff meets the first three factors, "the burden shifts to the government to show that "under the balancing test established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071; *quoting Thomas v. City of Beaverton,* 379 F.3d 802, 808 (9th Cir.2004). This factor "asks 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Eng*, 552 F.3d at 1071; *quoting Garcetti*, 547 U.S. at 418. This factor also recognizes that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id*.

Burch's claim on appeal that Defendants "made no argument on summary judgment in either their opening or reply briefing regarding this issue" is incorrect as Defendants specifically pointed to the "options in process" letter below as a

"clear case where the government's 'legitimate administrative interests outweigh the employee's First Amendment Case rights.'" 3-ER-418-9; *citing Eng,* 552 F.3d at 1071. Defendants clearly argued below that even assuming that Burch could establish the existence of an adverse action, that Burch could not establish that England's actions were pretextual because Burch's serious criticisms of England would have provided good cause to seek Burch's resignation. 3-ER-418 ("Frankly, Defendant England was not required to put up with a department head who was levelling such accusations.") The district court agreed with Defendants' argument, concluding that "Mayor England has met his burden of showing a nonpretextual reason justifying his actions against Burch." 1-ER-20. Burch advocated that the City change its form of governance and offered direct and serious criticisms of England's performance as Mayor. Burch's speech, even if it was otherwise protected, clearly had potential to affect the City's operations and therefore, England had a nonpretextual reason which justified any action that he did in fact take against Burch.

Finally, the district court correctly found that England "would have taken the same actions even if Burch had not supported Heiner for mayor." 1-ER-20. This Court has held that this "but-for causation inquiry is purely a question of fact," but also stated that "[i]mmunity should be granted on this ground only if the state successfully alleges, without dispute by the plaintiff, that it would have made the

same employment decisions even absent the questioned speech." *Eng*, 552 F.3d at 1072. Since Burch's yard sign was the only protected speech, it is undisputed that England would have taken action against Burch even in the absence of Burch's support for Heiner because Burch criticized England beginning in June 2021, and Burch himself claimed that England allegedly began reducing his workload at that time. 2-ER-40. Therefore, every single one of the *Eng* factors weighs in favor of Defendants, with the sole exception that Burch's yard sign did in fact constitute protected speech, even drawing inferences in favor of Burch. This Court should therefore affirm the decision of the district court and dismiss Burch's appeal.

Although the district court did not reach this decision below because Burch failed to establish his *prima facie* case, Defendants also contend that even if all of Burch's speech could be considered protected speech, Burch was subject to the policymaker exemption. 1-ER-11, n. 6. Although "the First Amendment protects a public employee from being fired or retaliated against based on his or her political opinions, memberships, or activities," *Summers v. City of McCall*, 84 F.Supp.3d 1126, 1153, *citing Hunt v. County of Orange,* 672 F.3d 606, 611 (9th Cir.2012), the "Supreme Court has delineated a narrow exception to this rule "permitting dismissals on the basis of political beliefs of those employees in 'policymaking positions.'" *Id*., *quoting Elrod v. Burns,* 427 U.S. 347, 367 (1976).

This Court has recognized that with regard to the policymaking exception that "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Hunt*, 672 F.3d at 611-2. This Court has also recognized that "[A] public employee need not literally *make* policy in order to fit within the *Elrod* policymaker exception. Rather, an employer may fire a public employee for purely political reasons if the employer can demonstrate that political considerations are 'appropriate requirement[s] for the effective performance' of the job." *Hunt*, 672 F.3d at 611-2; *quoting Fazio v. City and County of San Francisco,* 125 F.3d 1328, 1332 (9th Cir.1997). The "nonexclusive" factors in *Fazio* are: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Summers*, 84 F.Supp.3d at 1153; citing *Fazio*, 125 F.3d at 1334 n. 5.

As Defendants noted below, in *Summers*, the district court held that the police chief was a policymaker after examining the *Fazio* factors. The district court held that "[t]he duties of the Police Chief involve, in large part, implementation of the policies and directives of the City Council and demand a certain level of allegiance and affiliation to the City Council as well as the City Manager."

*Summers*, 84 F.Supp.3d at 1158. Similarly, Burch's supervisor was England and Burch had contact with elected officials, as he testified that he presented the strategic plan to the City Council. 2-ER-38. Burch was a department head at the same level as other department heads. 2-ER-283. Burch also noted that he spoke on behalf of the City "on a few occasions." 2-ER-37. If a City Council and City Manager are entitled to the allegiance and affiliation of a police chief, then surely England, as the elected Mayor of the City of Chubbuck, is entitled to "a certain level of allegiance and affiliation" from one of his department heads. Even if Burch did have adverse action taken against him, Burch was subject to the policymaking exception and therefore any action that England or the City did take against him was justified for his criticisms of his supervisor's performance. Therefore, this appeal must be dismissed and this Court must affirm the decision of the district court.

Ultimately, a review of this brief and of the district court's decision reveals that the district court's citations, as well as Defendants' citations supporting the district court's decision, came primarily from Burch's own testimony and declaration in opposition to Defendants' motion for summary judgment. Burch cannot now complain that the district court accepted his own testimony and found that it was insufficient to establish that his First Amendment rights were violated. Because the district court correctly drew inferences and looked at the facts in the

light most favorable to Burch, this Court must dismiss Burch's appeal and affirm the decision of the district court.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON BURCH'S IPPEA CLAIM.

### a. The district court did not err when it determined that Burch's IPPEA claim was untimely.

The purpose of the IPPEA is to "protect[s] the integrity of government by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." *Cryer v. Idaho Department of Labor*, 332 F.Supp.3d 1260, 1270 (D. Idaho 2018). The statute of limitations for a claim under the IPPEA is 180 days "after the occurrence of the alleged violation of this chapter." Idaho Code § 6-2105(2). The Idaho Supreme Court held that whistleblower plaintiffs "must act promptly, within the 180-day period afforded by the Whistleblower Act to present a timely claim." *Eller v. Idaho State Police*, 165 Idaho 147, 158 (Idaho 2019).

Burch filed his Complaint on August 23, 2022. 3-ER-442. Burch was therefore precluded from asserting that any claimed adverse action which occurred prior to February 24, 2022 was a violation of the IPPEA. 1-ER-22. As the district court correctly found, Burch failed to put any evidence into the record that Defendants "took any adverse action against Burch after February 23, 2022." *Id*. The district court determined that Burch was not constructively discharged, and

therefore did not put forward any evidence that he suffered any "adverse action" within the required timeframe to assert an IPPEA claim. *Id*.

On appeal, Burch has still failed to point to any evidence of any "adverse actions" which fell within the statute of limitations. Burch cites from his letter that he delivered to Human Resources the day prior to his effective date of resignation as evidence of "adverse action." (Dkt. 9.1, p. 46); 2-ER-278. However, Burch's April 7, 2022 letter cannot be evidence of "adverse action" because Burch had already given notice a month earlier that he was voluntarily resigning his position. The April letter provides no evidence that any "adverse action" was taken against Burch during the required timeframe to bring an IPPEA claim.

Burch has not pointed to any evidence in the record that would show that any of the claimed "adverse actions" took place after February 24, 2022. There are no dates in any of Burch's citations to the record which fall after February 24, 2022. For example, Burch claims that "the training Burch helped develop and was intended to teach the other departments was an ongoing occurrence from which Burch was removed." (Dkt. 9.1, p. 46). Burch references his own deposition testimony and the deposition testimony of Scott Gummersall as purported evidence supporting his position, but neither testimony provides evidence that Burch was removed from the training after February 24, 2022. To the contrary, to the extent

that the evidence indicates that any alleged removal in fact occurred, it occurred in

2021, as Ms. Gummersall testified:

> Q. BY MR. DUSTIN: No other discussions. Okay. Did he expound on his distrust of Rodney? Did he say why he didn't trust him?
>
> A. No, not in that meeting. But I did -- I did have another meeting with the mayor where he talked to me individually, and we were talking -- he did say that it was really tied back to what happened with this city administrator/city manager position. And the mayor was concerned if some training that we were developing might be -- might have been a cover or a way to talk about removing him from office. And I assured the mayor that that was not correct, that the training meetings were all legitimate training meetings. It took a lot to stand up these meetings where we were training employees and training some other management. And I assured him that that was not the case. So that's -- that was the extent of our conversation.
>
> Q. When did that meeting take place?
>
> A. That was at the same time period, *like right after the election*.

3-ER-397, (11:8-12:3), emphasis added. Mr. Gummersall also testified that Burch

was removed from the training in 2021:

> Q. Why was he not an instructor for the trainings that occurred in 2021?
>
> A. The mayor did talk to me about that and just told me that Rodney wasn't going to be involved in the LIFT -- delivering the LIFT training.
>
> Q. Did he say why?
>
> A. He did not.

3-ER-398 (13:13-19). Burch himself also failed to provide any evidence in his own

testimony that any request that he no longer provide training took place after

February 24, 2022:

Q. Who asked you to not participate?

A. Mayor England.

Q. And what was that conversation like?

A. When he said he didn't have confidence in me and after all of this went down, I went to him and said, "Do you want me to continue to fulfill my role as instructor of this course?" And he told me, "No."

3-ER-337 (135:14-21). Burch testified that the occasion that England allegedly told Burch that he had no confidence in him was the November 5, 2021 meeting. 3-ER-328 (100:18-21). Therefore, the only reference in Burch's testimony as to when England allegedly removed Burch from the training was November 5, 2021. Burch never testified that this conversation with England or any other event which Burch claims constituted "adverse action" occurred after February 24, 2022.

Burch's other claimed reports of "waste" also fell outside of the required timeframe of the IPPEA. As the district court correctly determined, Burch testified that the Strategic Plan which England allegedly allowed to fall "to the wayside" was formulated in 2018, well outside of the statute of limitations, and Burch did not cite any dates for the "outcome budget process" or the issues with the "online bill-pay credit." 2-ER-38-39. Because Burch never put any evidence into the record that his reporting of alleged waste or any "adverse actions" occurred after February 24, 2022, the district court correctly found that Burch's IPPEA claim was filed outside the statute of limitations.

Contrary to Burch's claim, there is no precedent for finding that an "ongoing occurrence" acts to preserve an IPPEA action past the statute of limitations. In *Eller*, while the Idaho Supreme Court did hold that the plaintiff was permitted to bring an IPPEA claim, the Idaho Supreme Court limited the plaintiff's damages on his emotional distress claim arising out of the IPPEA to "those claims arising within the 180-day window before January 6, 2015, when his complaint was originally filed." *Eller*, 165 Idaho at 158. If England in fact took the actions that Burch claims he took within the 180-day timeframe, then Burch should have been able to put evidence into the record regarding the dates of those actions. However, Burch failed to point the district court to any evidence that any action had taken place within the required timeframe. The district court found, interpreting the facts in the light most favorable to Burch, that: "although Mayor England limited and reassigned some of Burch's work duties beginning in 2021, no evidence supports these actions occurred at any time after February 23, 2022." 1-ER-22. The district court correctly found that Burch had not met his burden under the IPPEA because even if England did take the actions that Burch alleged, then there must have been a certain date on which he took those actions. The testimony of Burch and Mr. Gummersall lends support to the district court's determination that if England's reassignment of the training and duties took place, then it took place before

February 24, 2022, and therefore the district court correctly found that Burch's claims fell outside the statute of limitations of the IPPEA.

Where Burch has failed to establish that he was constructively discharged, and where Burch has failed to point to any evidence in the record that the alleged adverse actions took place less than 180 days before he filed his Complaint, then this Court must affirm the decision of the district court and hold that Burch failed to bring his IPPEA claim in a timely manner.

### b.  The district court did not err when it determined that Burch did not engage in protected activity under the IPPEA.

The district court did not err when it found that Burch did not engage in any protected activity under the IPPEA. In order to establish an IPPEA claim, "a plaintiff must establish, by a preponderance of the evidence, that the employee has suffered an adverse action because the employee, or a person acting on his behalf engaged or intended to engage in an activity protected under section 6–2104, Idaho Code." *Cryer*, 332 F.Supp.3d at 1271; *citing Patterson v. State Dept. of Health & Welfare,* 151 Idaho 310 (2011). A plaintiff must establish a *prima facie* case by showing: "(1) he was an employee who engaged or intended to engage in protected activity; (2) his employer took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Cryer*, 332 F.Supp.3d at 1271; *citing Van v. Portneuf Med. Cntr.,* 156 Idaho 696, 330 P.3d 1054, 1059 (2014) ("Van II").

Courts generally apply the "*McDonnell Douglas* burden shifting analysis" to IPPEA claims at the summary judgment stage. *Cryer*, 332 F.Supp.3d at 1271; *see also Summers*, 84 F.Supp.3d at 1138. Under that standard, "once the plaintiff establishes a prima facie case, the employer may produce evidence that it discharged the plaintiff for a legitimate, non-retaliatory reason. If the employer meets this burden, the burden then shifts back to the plaintiff to prove that the legitimate non-discriminatory reason the employer proffered is, in fact, a pretext." *Cryer*, 332 F.Supp.3d at 1271 (internal citations omitted).

As the district court noted, there is no statutory definition of "waste" within the IPPEA, but the *Cryer* court found that "hiring unqualified candidates, needlessly duplicating or creating new positions, improperly awarding bonuses, and making hiring and firing decisions based on personal relationships could each constitute waste of public funds and manpower." *Cryer*, 332 F.Supp.3d at 1275. However, in *Cryer*, the district court also noted with regard to the plaintiff's allegations of violation of nepotism policies that the plaintiff had failed to identify any "specific personnel law, rule, or regulation that the alleged practices violated," and the *Cryer* court found that the alleged conduct did not violate any Idaho laws on nepotism. *Id.*

Similarly, given Burch's failure to identify any specific "waste" or violation of a law, rule, or regulation, the district court's concern that Burch was trying to

recast his own policy disagreements with England as reporting of "waste" was valid. 1-ER-24. Even if the term "waste" is broadly interpreted, Burch is still required to identify the specific waste or violation he claims that he reported which would bring him within the provisions of the IPPEA. *Id*. at 1272; *see also Black v. Idaho State Police,* 155 Idaho 570 (2013) (finding that for activity to be protected it must be in response to some predicate act by the employer that either actually constitutes a violation, or that an objectively reasonable person could suspect constitutes a violation).

It is in this context that the district court's mention of Burch's failure to allege that "Defendants misused public assets in an illegal, unethical, or inappropriate manner" must be understood. 1-ER-23. Contrary to Burch's claims, the district court is not applying an additional standard to the requirements of the IPPEA but is instead distinguishing activity that "either actually constitutes a violation, or that an objectively reasonable person could suspect constitutes a violation" from activity that is neither a violation nor a suspected violation but is instead a policy or procedural disagreement.

Burch himself testified, as Defendants noted below, that his advocacy of the city administrator position was not in fact a report of "waste in manpower:"

> Q. And you're saying, I think, here that your proposal to have a city manager appointed would also address this waste in manpower?

> A. Yes. Absolutely.

Q. And so it's your belief that – in 2021, when you were proposing the appointment of a city administrator, do you believe that was you reporting waste in manpower then?

A. No.

Q. Okay. It had already been reported years earlier, if I'm tracking with you?

A. Right. And we – yes. And we set in place tools to help facilitate and mitigate that waste, yes.

Q. And so if I'm tracking with you, your proposal of the city administrator was basically another tool to try to mitigate that in 2021?

A. Yes.

3-ER-347 (174:25-175:13); 3-ER-426-7. Burch then tried to claim that he was "confused" during his deposition and that he did in fact link the "the waste of funds and manpower to his proposal for a city administrator in his June 1, 2021 letter and his discussions with England." 2-ER-262. Aside from the fact that any claimed report of waste in June 2021 is well outside the IPPEA's six-month statute of limitations, Burch failed to show below that his advocacy for the city administrator position was not merely a policy disagreement with England.

Burch now claims on appeal that "failing to have a city administrator was costing the City money and a loss of revenue," but Burch again ignores the fact that while the IPPEA protects reporting of waste or violations, it does not force employers to adopt every proposed solution to waste or violations which have already been brought to an employer's attention. (Dkt. 9.1, p. 53). Furthermore, it

does not protect employees who proceed to attack their supervisors under the guise of reporting "waste." Burch's example with regard to the online bill-pay only shows that Burch's claimed concerns constituted a policy disagreement and not genuine reporting of waste. Burch did not put any evidence into the record showing that an online bill-pay system "ended up doing nothing but costing the water department a $60,000 loss in revenue." (Dkt. 9.1, p. 53). This is a policy disagreement, not a reporting of waste, and Burch's claim that the online bill-pay issue could only have been remedied by a city administrator demonstrates that fact.

Burch has not cited to any authority showing that the City was required to change its form of governance simply because Burch believed that a city administrator would be more efficient. Ultimately, Burch's argument is at its core a claim that he knew better than England, his supervisor, how the City should be run. This is evidenced by the criticisms that Burch leveled at England in the "Options in Process" document, including a claim that England did not "understand what is really going on and appear to not have any interest," that England had no "clear / committed vision," and that England could not be trusted to "objectively address issues." 2-ER-52-54. Burch has cited no case law or authority which required England to accept these criticisms, and England was not required to keep a department head that he believed was insubordinate.

England testified that he believed that the "options in process" letter was a form of insubordination. 2-ER-196 (78:25-79:9). Neither policy disagreements nor open attacks on an employee's supervisor, regardless of whether Burch believed that he had a "strong relationship" with England, are protected activities under the IPPEA. (Dkt. 9.1, p. 54). Therefore, the district court correctly found that Burch's actions did not constitute protected activities under the IPPEA and this Court should dismiss Burch's appeal.

Furthermore, although the district court did not reach this determination because it correctly found that Burch failed to meet the first element of his *prima facie* case, Burch is still required to demonstrate as part of his *prima facie* case that his employer actually took adverse action against him and is also required to demonstrate "the existence of a causal connection between the protected activity and the employer's adverse action," and he failed to demonstrate both of these requirements below.

Burch failed to establish that any "adverse actions" were taken against him. "Adverse action" under the IPPEA "means to discharge, threaten or otherwise discriminate against an employee in any manner that affects the employee's employment, including compensation, terms, conditions, location, rights, immunities, promotions or privileges." Idaho Code § 6-2103(1). Burch was not subject to any "adverse actions," particularly when compared to situations such as

that found in *Eller v. Idaho State Police*. In that case, the plaintiff, a trooper with

the Idaho State Police, was accused by a commanding officer of lying under oath,

was downgraded in his performance review, was placed back on patrol duties

while still being required to perform his previous duties, was removed from a

position, was "prohibited…from teaching altogether," and had his application for a

pay raise denied. *Eller*, 165 Idaho at 152-3. Nothing like this happened to Burch.

Burch was not demoted, was never accused of committing a crime, was never

denied a pay raise, and never received a negative performance evaluation. Burch

was removed from some training duties, but only after Burch went to England and

asked that some of his duties be reassigned, as Burch admitted that he went to

England and claimed that his duties were becoming too much. 2-ER-237. Where

Burch cannot allege that he suffered any "adverse action," he cannot prove his

*prima facie* case and his IPPEA claim must be dismissed.

However, even if Burch could allege an "adverse action" for the purposes of

the IPPEA, because Burch's advocacy for the city administrator position was not

"reporting of waste," Burch cannot prove a causal connection between any

protected activity he may have engaged in and any alleged adverse action. Burch

testified that he did not believe that England's alleged request that Burch resign

came about because he advocated for the city administrator position, but instead

believed that it happened because he supported England's opponent in the 2021 election:

> Q. As you sat there, did you believe that was part of the reason?
>
> A. Yes.
>
> Q. Why did you think that?
>
> A. I believe he knew who I supported and -- I don't know. I -- I couldn't -- I don't know any other reason. It had to have been who I had politically supported. There was no performance reason to seek resignation.

3-ER-330, (106: 5-13). Burch cannot now claim that the alleged "adverse actions" which the City and England supposedly took against him were taken because he advocated for the city administrator position when he testified that his belief was that England allegedly asked him to resign because of his support of England's opponent.

Burch also testified that he reported "waste" in 2018 when he allegedly reported to England that salaries were not being allocated correctly. 3-ER-346 (172: 2-20). However, this report is again outside the six-month statute of limitations of the IPPEA, and furthermore, Burch testified that he did not believe that England took any actions against him because of the discussion surrounding the salary allocation issue:

> Q. Do you believe that the mayor's request for you to resign in November of 2021 had anything to do with this spreadsheet allocation that we've been talking about?

A. I -- I don't think so.

3-ER-347 (173:25-174:4). Where Burch cannot establish that any alleged "adverse actions" were connected to any alleged reporting of waste, Burch cannot meet the elements of his *prima facie* case under the IPPEA, and this Court should uphold the decision of the district court.

## CONCLUSION

Based on the foregoing, this Court should affirm the decision of the district court and should dismiss Burch's appeal. Defendants further request costs on appeal pursuant to F.R.A.P. 39(a)(2). Pursuant to Circuit Rule 39.1(6), Defendants request attorneys' fees and will file a request following this Court's decision.

Dated: October 30, 2024.

 /s/ *Sam L. Angell*
SAM L. ANGELL

## CERTIFICATE OF COMPLIANCE
## Pursuant to Circuit Rule 32-1

I certify that this brief is proportionately spaced, has a typeface of 14 points or more, and contains 10,608 words.

Dated: October 30, 2024.

 /s/ *Sam L. Angell*
SAM L. ANGELL

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I state that there are no related cases pending in this Court.

Dated: October 30, 2024.

 /s/ *Sam L. Angell*
SAM L. ANGELL

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document upon the following on October 30, 2024, by electronically filing with the Clerk of the Court using CM/ECF system to the following persons:

DeAnne Casperson, Esq.
Amanda Ulrich, Esq.
Ryan S. Dustin, Esq.
CASPERSON ULRICH DUSTIN
356 W Sunnyside Road, Ste B
Idaho Falls, ID 83402
Email:dcasperson@workandwage.com
Email: aulrich@workandwage.com
Email: rdustin@workandwage.com


 /s/ *Sam L. Angell*
SAM L. ANGELL